UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| KRISTYN THERRIEN,<br>    Plaintiff,<br><br>v.<br><br>MERRICK B. GARLAND, Attorney General of the United States, U.S. DEPARTMENT OF JUSTICE,<br>    Defendant. | Docket No. |

# COMPLAINT AND JURY DEMAND

## INTRODUCTION

1. Plaintiff Kristyn Therrien ("Plaintiff" or "Ms. Therrien") is an experienced nurse with an excellent performance history, who has risen to the position of Director of Nursing at the Federal Bureau of Prisons' ("BOP") facility, Federal Medical Center Devens ("FMC Devens"). The BOP discriminated and retaliated against Ms. Therrien based on her sex and parental status when it disciplined her for alleged failures to follow leave procedures and after she engaged in protected activity by complaining about the BOP's unlawful denial of a promotion to an older female nurse in favor of a lesser qualified younger male, which is set forth in a related matter before this Court, *Peggy Smithart v. Garland et al.*, Docket No. 01:22-CV-10777. Ms. Therrien now seeks redress for the BOP's unlawful conduct pursuant to Title VII of the Civil Rights Act of 1964. The BOP has not disciplined male members of management despite the fact that these male members repeatedly arrive to work late and leave work early.

1

2. Ms. Therrien has worked at the BOP for nearly two decades, rising up the ranks as a line staff nurse to ultimately become the Director of Nursing at FMC Devens. She has received exemplary performance reviews during her tenure, including during the challenges FMC Devens and other BOP facilities faced during the early months of the COVID-19 pandemic.

3. Ms. Therrien expressed opposition to a BOP hiring decision on her team, which disregarded her recommended female candidate and instead prioritized the input of several FMC Devens male associate wardens, who have a history of sexist treatment of Ms. Therrien and other female nursing staff and creating a climate of gender-based hostility. Ms. Therrien complained to FMC Devens' Warden, Amy Boncher ("Warden Boncher") about the promotion of a younger male candidate who did not meet the qualifications of the position and questioned why Peggy Smithart ("Ms. Smithart"), an older and substantially more experienced female nurse, was not promoted instead.

4. The BOP then began to treat Ms. Therrien adversely by reassigning her work responsibilities, isolating her and cutting her out of communications, and penalizing her for seeking a slightly later work start time that previously was not an issue for her and was routinely allowed for her male colleagues. She had previously made a request for a 30-minute adjustment in her work schedule from 7:30AM to 4:00PM to 8:00AM to 4:30PM for her childcare needs without denial. Following her engagement in protected activity, Associate Warden Michael Underwood ("AW Underwood") referred Ms. Therrien twice for being late to work, which ultimately culminated in a suspension.

5. The BOP has not disciplined male managers despite the fact that they repeatedly arrive to work late and leave work early. The Chief Clinical Director tried to refer the male Chief

Dental Officer for not only arriving at work 15 to 20 minutes late but leaving work two hours early on multiple occasions. The Chief Dental Officer did not make up his hours, but his case was dropped without discipline. The male Chief Pharmacist always arrives after 8:00AM without discipline even though AW Underwood asserts that Department Heads must work from 7:30AM to 4:30PM. Similarly, the male Chief Psychiatrist does not arrive before 8:00AM and leaves before 4:00PM every day without discipline. Only Ms. Therrien, a single mother and the Director of Nursing, has been punished for being late to work due to the need for childcare-related accommodations.

6. In light of the objective evidence that male managers repeatedly arrived to work late and left work early without discipline, the BOP's unsupported claim that it disciplined Ms. Therrien for investigation because she was late and treated her the same as all other managers, is based on sex discrimination and retaliation that have no place in the workplace.

7. As a result of Defendants' unlawful and discriminatory actions, Plaintiff has suffered and continues to suffer substantial damages, including but not limited to a suspension that resulted in loss of pay, cost of living increases due to relocation to accommodate the BOP's discriminatory work schedule, serious reputational harm, pain and suffering, and emotional distress.

## JURISDICTION AND VENUE

8. This action arises out of violations of Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e-16. This court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331.

9. Ms. Therrien filed a related complaint of discrimination before the Equal Employment Opportunity Commission ("EEOC") on June 4, 2021.

10. The conduct giving rise to these claims occurred at Federal Medical Center Devens, a Bureau of Prisons facility located in Worcester County, Massachusetts. Accordingly, venue is proper in this court.

## PARTIES

11. Plaintiff Kristyn Therrien is currently employed by the United States Department of Justice, Federal Bureau of Prisons at Federal Medical Center Devens as Director of Nursing. She is a resident of Nashua, New Hampshire.

12. Defendant Merrick B. Garland is the Attorney General of the United States. He is named in his capacity as head of the Department of Justice, Bureau of Prisons.

## FACTS

<u>Plaintiff's Qualifications and History at the BOP</u>

13. Ms. Therrien is a Registered Nurse (RN) and is currently employed as the Director of Nursing at FMC Devens (GS series 0610, Grade 13) as part of the BOP.

14. Ms. Therrien has worked as a nurse at the BOP since 2004, when she was hired as a line staff nurse (GS 10). She worked in that role for over five years before being promoted into a management role, becoming a Clinical Nurse Manager (GS 11). After working in that role for three years, Ms. Therrien was promoted first to the Assistant Director of Nursing ("ADON") role (GS 12) and then to the Director of Nursing role the following year (GS 13). She has been serving as the Director of Nursing at FMC Devens since this promotion in 2013.

15. In her capacity as Director of Nursing, Ms. Therrien is responsible for all clinical and oversight services for inmates at FMC Devens, which includes the supervision, training, and staffing of 38 nurses. FMC Devens is the northeast regional medical facility for the BOP's male inmate population.

16. Prior to her employment at FMC Devens, from 1998 through 2004, Ms. Therrien worked for Saint Memorial Medical Center and D'Youville Senior Care in Lowell, Massachusetts, and Palm Manner Nursing Facility in Chelmsford, Massachusetts.

17. In 1998, Ms. Therrien earned a Bachelor of Science in Nursing from University of Massachusetts Lowell.

18. In addition to receiving promotions at the BOP, Ms. Therrien has received a rating of "overall outstanding" in all her yearly evaluations with the exception of one year when she underwent double-knee replacement surgery and missed some months of work to recover.

19. Ms. Therrien has received numerous awards including many Special Act Awards, two Supervisor of the Quarter Awards, Time Off Awards, and one Supervisor of the Year Award.

20. Ms. Therrien has never received a negative performance review during her 18 years of service at the BOP.

21. Through much of early 2020, Ms. Therrien received praise for the work that she was doing.

    a. On March 12, 2020, Ms. Therrien and the clinical director at the time, Dr. Megan Shaw ("Dr. Shaw"), received an email from AW Underwood stating, "you two are amazing." This message was in response to the significant added

       responsibility that Ms. Therrien took on during the COVID-19 crisis at FMC Devens.

    b. On March 16, 2020, Ms. Therrien received an email from AW Underwood stating, "You are doing an amazing job and I am grateful to have you on the team."

    c. On May 22, 2020, Ms. Therrien received a text message from AW Underwood emphasizing what a good job she was doing.

22. AW Underwood knows about Ms. Therrien's status as a single mother and has made negative comments to Ms. Therrien about it.

23. In July 2020, when Ms. Therrien returned from vacation, AW Underwood asked where she had gone and what she had done. After Ms. Therrien explained that as a single parent, she had used a donor to have a child, and that she and her daughter were on vacation with her daughter's half siblings (siblings whose mother used the same donor as Ms. Therrien), AW Underwood responded by telling her, "that's fucking weird."

Assistant Director of Nursing Recommendation

24. In August 2020, one of Ms. Therrien's nurse managers, Peggy Smithart ("Ms. Smithart"), was denied a promotion to the Assistant Director of Nursing ("ADON") position in favor of a younger and less qualified male employee despite Ms. Therrien's strong recommendation for Ms. Smithart. Ms. Therrien listed Ms. Smithart's many skills and qualifications in support of that recommendation.

25. At FMC Devens, the recommendation of a department head, like Ms. Therrien, typically carries significant weight or is a determinative factor in the personnel decisions of employees in that department.

26. Only two candidates for the open ADON position were referred for consideration: Ms. Smithart and staff nurse, Seth Einhorn ("Mr. Einhorn"), a 33-year-old and heterosexual man. At the time of the job opening, Ms. Smithart was 50 years old and a Clinical Nursing Supervisor. She is an openly gay woman.

27. Ms. Smithart met the educational requirements of the ADON posting, and she far exceeded the other requirements, including the required year of experience equivalent to the next lower grade level. In fact, Ms. Smithart had many years of experience with each of the four posted examples of required leadership experience.

28. Warden Boncher did not interview Ms. Smithart as part of the ADON hiring process. Warden Boncher and Ms. Smithart had spoken only briefly on one occasion prior to Warden Boncher's decision.

29. Ms. Therrien also repeatedly recommended to AW Underwood that Ms. Smithart should be appointed to the ADON position, not Mr. Einhorn. During these conversations, Ms. Therrien explained to AW Underwood that Ms. Smithart was the more qualified candidate, and that Mr. Einhorn's lack of relevant experience was concerning.

30. On information and belief, Warden Boncher relied on input from associate wardens Michael Underwood, Hossam Georgy, and Kimo Elraheb to make the ADON selection in August 2020. At the time of the ADON posting, AW Underwood was the associate warden in charge of medical staff, including nursing. These male associate wardens have treated Ms. Smithart and other female nursing staff differently than their male peers, including by ignoring them in staff meetings, reprimanding them for voicing their opinions on matters within their purview, and drastically changing their schedules without consulting them. The repeated disparate treatment of female nursing staff

compared to male staff further illuminates the climate of gender-based hostility at the BOP.

31. Prior to the public announcement of the BOP's decision to promote Mr. Einhorn over Ms. Smithart, on August 25, 2020, Mr. Einhorn contacted Ms. Therrien and told her how he attempted to decline the ADON position with both Warden Boncher and AW Underwood because Ms. Smithart was the most qualified candidate and should have been selected for the ADON position.

32. Following the decision, Ms. Therrien indicated her opposition to the discriminatory promotion decision and was vocal and supportive of Ms. Smithart's intentions to pursue an EEOC claim for gender, sexual orientation, and age discrimination in violation of both Title VII and the ADEA.

33. After Mr. Einhorn's selection was announced publicly on August 26, 2020, Ms. Therrien met separately first with her supervisor, AW Underwood, on August 27, 2020, and then with Warden Boncher on September 5, 2020. In both meetings, Ms. Therrien complained about the selection of Mr. Einhorn over Ms. Smithart given her far superior qualifications and asked for an explanation of the decision. In both meetings, Ms. Therrien's supervisors refused to provide any explanation.

34. In the meeting with AW Underwood on August 27, 2020, AW Underwood walked out of the meeting after refusing to provide an explanation for Mr. Einhorn's selection.

35. In the meeting with Warden Boncher on September 5, 2020, Warden Boncher refused to explain the decision. Instead, Warden Boncher told Ms. Therrien that she expected "loyalty" from department heads and that Ms. Therrien may not be in the right position if she could not get "on board" with the decision. After Ms. Therrien continued to question

Mr. Einhorn's selection, Warden Boncher declared "this meeting is over" and opened the door.

Retaliation Following ADON Selection

36. After Mr. Einhorn's selection, AW Underwood did not stop by Ms. Therrien's office for over three months. Prior to the selection, AW Underwood had stopped by Ms. Therrien's office two or three times each week.

37. On September 9, 2020, Ms. Therrien sent an email to AW Underwood requesting a change in her work hours to accommodate a change in her child's day care hours. AW Underwood never responded to the request.

38. On September 21, 2020, AW Underwood emailed Ms. Therrien requesting that she come to his office for a discussion. In this discussion, AW Underwood and Ms. Therrien discussed her arrival time between 8:10AM and 8:15AM. After Ms. Therrien explained her childcare constraints, AW Underwood asked how long such constraints would remain, to which Ms. Therrien told him that the schedule would likely remain for the duration of the school year unless there was a larger change in the state of the COVID-19 pandemic. Ms. Therrien also noted that she did not know what her childcare constraints would be in summer 2021.

39. During the same meeting, AW Underwood told Ms. Therrien that there had not been a pay period since the previous November when Ms. Therrien had not taken some leave. AW Underwood stated that such time away was not helping morale in the department.

40. Following the meeting, Ms. Therrien reviewed her previous timesheets, which showed that Ms. Therrien had requested to come in late multiple times during the summer not for personal reasons, but because Ms. Therrien had worked late at FMC Devens the night

before to complete COVID-related tasks. In some of these weeks, Ms. Therrien worked up to 40 hours of compensatory time.

41. In September 2020, FMC Devens changed its policies, so that nursing was no longer to attend Special Housing Unit ("SHU") meetings where quarantine in SHU cases were discussed. Clinical Director, Dr. Shaw, noted that Ms. Therrien would have information relevant to their discussions since Ms. Therrien was responsible for COVID-19 tracking during the peak of the pandemic.

42. As the point person for COVID-19 tracking, Ms. Therrien worked closely with health service executive staff during the peak of the COVID-19 crisis to test all inmates, and track inmates with positive symptoms, managing their quarantine status. Ms. Therrien would sometimes stay until 3:00AM or 4:00AM in the morning to help test the entire unit of inmates and worked hundreds of hours in overtime to ensure that the nursing staff did not have to handle all the testing alone. Ms. Therrien also placed and wrote orders to get the COVID-19 tests.

43. On October 2, 2020, Ms. Therrien was informed that Health System Administrator, Edward Eichel ("Mr. Eichel") would be taking over the COVID-19 tracking as of October 5, 2020, which deprived of Ms. Therrien of significant responsibilities relevant to her work.

44. On December 22, 2020, only at the request of Dr. Shaw, the BOP re-assigned COVID-19 tracking responsibilities back to Ms. Therrien.

45. In December 2020, following news of a COVID-19 vaccine to become available, AW Underwood excluded Ms. Therrien and nursing staff from vaccine-related matters, instead telling Chief Pharmacist, Dean Overmiller ("Mr. Overmiller"), that Mr.

    Overmiller would be in charge of vaccine-related matters and that AW Underwood specifically did not want nursing involved.

46. On February 11, 2021, Ms. Therrien emailed AW Underwood to request a vacation week.

47. On February 12, 2021, AW Underwood approved the vacation request, but added that Ms. Therrien must find a single person to cover her work while she was away, and that this person must be well-versed in sending COVID-19 protocol emails to the entire staff at FMC Devens. This was a significant burden on a single staff member and the first time such a requirement was imposed on any department head and ran counter to the common practice of allowing multiple staff members to provide coverage when another staff member was on vacation.

48. On March 4, 2021, Ms. Therrien was told that she had been referred two times for coming in late. The first occurrence was on February 4, 2021, and the second was on February 12, 2021.

49. Special Investigative Agent ("SIA"), Steven Mayorga, informed Ms. Therrien that it was well-known that other managers (who were male) were repeatedly late or left their shift hours early without notification. However, Ms. Therrien learned that they were not referred for discipline and instead were given opportunities to explain or correct their hours. Neither AW Underwood nor Warden Boncher ever gave Ms. Therrien an opportunity to explain or correct her hours.

50. In addition to SIA Mayorga's observation, in July 2020, at the end of a shift one day, Ms. Therrien brought supplies to the front lobby screening site at about 4:05PM. Upon seeing Ms. Therrien, AW Underwood commented, "Wow, there are still people here after 4:00PM," indicating that he was aware that staff were rarely at the institution at the end

of their shift and that there was tacit acceptance that people were not completing the 8 hours for which they were responsible. Contrary to AW Underwood's comment, Ms. Therrien typically worked past 5:00PM each night but was only at the front lobby at 4:05PM because she had to bring supplies to prepare for the shift change.

51. On March 18, 2021, Mr. Overmiller scheduled a meeting for the following day to begin at 8:30AM. The next day, Mr. Overmiller arrived at the meeting at 8:40AM, 10 minutes after the meeting was set to begin. In providing an explanation to the group, which included AW Underwood and Warden Boncher, Mr. Overmiller only stated that "the bus was late." Mr. Overmiller was not disciplined for his tardiness.

52. On March 19, 2021, Mr. Overmiller arrived at the meeting at 8:40AM, 10 minutes after the meeting was set to begin. In providing an explanation to the group, which included AW Underwood and Warden Boncher, Mr. Overmiller only stated that "the bus was late."

53. On March 25, 2021, Ms. Therrien spoke with human resources staff at a recruiting event regarding her referral. In the same conversation, Ms. Therrien also inquired about the EEOC process because of her concerns that she was being treated adversely based on her sex.

54. On April 2, 2021, a week after Ms. Therrien complained about AW Underwood's treatment of her to human resources, AW Underwood spoke to Mr. Overmiller about his tardiness. AW Underwood stated that he was "sorry to have this awkward conversation" and directed Mr. Overmiller to "please watch your time." AW Underwood noted that Mr. Overmiller had come in at 9:00AM the previous week and neglected to tell anyone. AW Underwood said, "consider this your verbal warning" to Mr. Overmiller. Ms. Therrien

never received a verbal warning for her tardiness prior to receiving her referral, and never received any letter of counsel prior to receiving her referral pursuant to standard BOP discipline protocol.

55. That same day, AW Underwood also spoke to Mr. Eichel about his tardiness. AW Underwood stated that he "hated" to have this conversation, but that he needed to tell Mr. Eichel to watch his time. AW Underwood mentioned that he felt he needed to talk to Mr. Eichel because a female in the department had claimed that AW Underwood only talked to women about their time. Mr. Eichel informed Ms. Therrien that AW Underwood had never spoken to him about his time before.

56. As of May 13, 2021, Ms. Therrien was the relevant department head related to quarantine at FMC Devens. On May 13, 2021, AW Underwood sent an email to all department heads within Health Services with information related to a WebEx on quarantine and vaccine procedural changes. Ms. Therrien was the only Health Services department head excluded from this email despite her particular relevance to a meeting on quarantine changes.

57. On May 27, 2021, FMC Devens held a staff appreciation breakfast. Ms. Therrien and Mr. Einhorn both arrived in the parking lot at 7:45AM. Mr. Overmiller arrived at 8:05AM. That day, Assistant Warden Hossam Georgy ("AW Georgy") sent an email to the department heads and assistant heads within the medical department, informing them that they needed to notify him if they were going to arrive more than 15 minutes late. Ms. Therrien learned that Mr. Overmiller was scheduled to begin work at 8:00AM, and since then has learned that other male managers have later start times than she does despite the BOP's claim that all managers must begin work at 7:30AM.

58. On May 27, 2021, Ms. Therrien requested to proceed with the EEO counseling process and submitted her Request for EEO Counseling Forms for review.

59. On Monday, December 13, 2021, the BOP formally suspended Ms. Therrien for "Absent Without Leave and Failure to Follow Leave Procedures." Ms. Therrien was scheduled to return to work on Tuesday, December 14, 2021.

60. The BOP's discriminatory and retaliatory treatment of Ms. Therrien has resulted in substantial damages to her. She was suspended and suffered loss of pay and professional and reputational damage from the baseless disciplinary infractions in her record. She also has suffered further financial consequences because she was forced to relocate and move her daughter to different school to meet the BOP's insistence of an earlier start time not applied to male managers. Finally, she has suffered significant emotional distress from the BOP's discriminatory and retaliatory treatment of her, including depriving her of her work responsibilities, excluding her from critical communications related to her work, and baseless punishing her for conduct that male managers engage in with impunity.

## COUNT ONE
### Sex and Gender Discrimination
### 42 U.S.C. § 2000 *et seq.* (Title VII of the Civil Rights Act of 1964, as amended)

61. Plaintiff incorporates and realleges the allegations stated in the previous paragraphs as if fully stated herein.

62. Defendant, through the acts and omissions as described above, has unlawfully discriminated against Plaintiff because of her sex and gender, including gender-based stereotypes based on parental status, in violation of 42 U.S.C. § 2000 *et seq.* (Title VII of the Civil Rights Act of 1964, as amended).

63. As a result of Defendant's actions, Plaintiff has suffered and continues to suffer substantial damages, including but not limited to a suspension that resulted in loss of pay, cost of living increases due to relocation to accommodate the BOP's discriminatory work schedule, serious reputational harm, pain and suffering, and emotional distress.

**COUNT TWO**
**Retaliation**
**42 U.S.C. § 2000 *et seq.* (Title VII of the Civil Rights Act of 1964, as amended)**

64. Plaintiff incorporates and realleges the allegations stated in the previous paragraphs as if fully stated herein.

65. Defendant, through the acts and omissions as described above, has unlawfully retaliated against Plaintiff because of her engagement in protected activity in violation of 42 U.S.C. § 2000 *et seq.* (Title VII of the Civil Rights Act of 1964, as amended).

66. As a result of Defendant's actions, Plaintiff has suffered and continues to suffer substantial damages, including but not limited to a suspension that resulted in loss of pay, cost of living increases due to relocation to accommodate the BOP's discriminatory work schedule, serious reputational harm, pain and suffering, and emotional distress.

WHEREFORE PLAINTIFF REQUESTS THAT THE COURT ORDER:

a. The judgment be entered for her and against Defendant;

b. That Plaintiff be compensated for any loss of pay and/or benefits due to suspension, and damage to reputation, incurred as a result of Defendant's unlawful acts;

c. That Plaintiff be awarded an amount of money that will fairly compensate her for the cost of living increases due to relocation, and the emotional and physical pain and suffering caused by Defendant's unlawful acts;

d. That Defendant pay Plaintiff's costs and attorneys' fees resulting from this action;

e. That Defendant pay Plaintiff interest on any judgment as provided by law;

f. That Defendant be ordered to pay Plaintiff liquidated, multiple, and/or punitive damages, to the extent such damages are available;

g. That Defendant be ordered to pay such relief as will make Plaintiff whole; and

h. That the Court order such other relief as may be just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

    Respectfully submitted,
    KRISTYN THERRIEN

    By her attorney,

    /s/ Monica R. Shah
    MONICA R. SHAH (Mass. Bar. No. 664745)
    ZALKIND DUNCAN & BERNSTEIN LLP
    65a Atlantic Avenue
    Boston, MA 02110
    (617) 742-6020 (telephone)
    (617) 742-3269 (fax)
    mshah@zalkindlaw.com

Dated: November 10, 2022